```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| JAYEFF CONSTRUCTION CORP.,<br><br>    Plaintiff,<br><br>    v.<br><br>LABORERS' INTERNATIONAL UNION<br>OF NORTH AMERICA, et. al.,<br><br>    Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 05-5027<br>        (JEI/KMW)<br><br>**OPINION PURSUANT TO<br>FED.R.CIV.P. 52(a)(1)** |

**APPEARANCES:**

STERNS & WEINWORTH
Robert Zoller
50 West State Street
Suite 1400
P.O. Box 1298
Trenton, New Jersey 08607
    Counsel for Plaintiff

KROLL HEINEMAN CARTON, LLC
Michael G. McNally
99 Wood Avenue South
Suite 307
Iselin, NJ 08830
    Counsel for Defendants

**IRENAS**, Senior District Judge:

In this declaratory judgment action, Plaintiff seeks to void a short form agreement that incorporates a statewide collective bargaining agreement ("CBA") by reference. Upon becoming a signatory to a statewide CBA, a contractor must hire only union laborers and remit union benefits for all New Jersey projects.

There are three ways a contractor can become a union shop:

1

(1) the contractor can "give their bargaining rights to the building contractors of New Jersey or the masons contracting association;" (2) the contractor can sign the full statewide CBA; or (3) the contractor can sign a short form agreement that incorporates the statewide CBA by reference. (Trial Tr. 120:6-10, July 10, 2012) On the other hand, for a more limited collective bargaining agreement, a contractor can enter into a "project only" agreement that will bind the contractor to hire and pay union benefits on a project specific basis. (Trial Ex. J-1) The dispute here revolves around the interplay between the short form and project only agreements.

On July 9, 2012, this Court held a two day bench trial solely on the issue of liability. Although Plaintiff originally advanced several contract formation defenses, Plaintiff briefed and raised only fraud in the execution at trial.

## I. Findings of Fact

1. Plaintiff is a commercial construction general contracting company that has been in business since 1987. (Stip. Fact ¶ 1)[1] Jayeff directly employs relatively few employees, instead electing to subcontract to specialized companies. (Trial Tr. 8:1-7, July 9, 2012) This work is also known as construction

---

[1] This citation refers to the stipulated facts of the Joint Final Pretrial Order at pages 2-4, Feb. 24, 2011, Dkt. No. 76.

management. (Trial Tr. 8:20, July 9, 2012)

2. Defendants New Jersey Building Laborers Statewide Benefit Funds and the Trustees thereof are trust funds and employee benefit plans and their respective fiduciaries. (Stip. Fact ¶ 2)

3. Throughout its existence, Jayeff utilized an open shop labor force, which means that Jayeff hired and subcontracted without regard to union affiliation.[2] (Stip. Fact ¶ 3; Trial Tr. 8:1-7, July 9, 2012) Approximately 75% of Jayeff's business has been non-union. (Trial Tr. 93:22, July 9, 2012)

4. Prior to 2001, Jayeff occasionally hired one or two union laborers on big projects to "make [the union representative] look good." (Trial Tr. 9:11-12, July 9, 2012) Although Jayeff would pay union benefits, Jayeff refused to sign the statewide CBA. (Trial Tr. 56:14-15, July 9, 2012) For fifteen years, Jayeff and the local unions interacted without a written contract. (Trial Tr. 9:5-12, July 9, 2012)

5. In 2001, Plaintiff began construction on the Wyndham Hotel in Elizabeth, New Jersey. (Trial Tr. 10:10-11, July 9, 2012) This was a high profile project, and Jayeff employed several union laborers. (Trial Tr. 11:16-20, July 9, 2012) Due to the large number of laborers, the union requested that Jayeff sign an agreement. (Trial Tr. 12:10-14, July 9, 2012) For the

---

[2] If the client wanted a union labor force, which happened on occasion, then Jayeff would hire and subcontract to union affiliated laborers and companies.

first time in the parties' relationship, Plaintiff entered into a project only agreement with Local No. 394, which was affiliated with the Laborers International Union of North America and Affiliated District Council and Local Unions (collectively "LIUNA"). (Stip. Fact ¶ 5)

6. The Wyndham Hotel project only agreement was memorialized on a preprinted union form entitled "Short Form Agreement, Project Only Form" and dated October 12, 2001. (Stip. Fact ¶ 6; Trial Ex. J-1) Chief Financial Officer Kenneth Schwarz signed the agreement on behalf of Jayeff. (*Id.*)

7. The project only agreement, like the short form agreement, incorporated the full statewide CBA by reference, which bound Jayeff to employ or subcontract only to union laborers and companies for the duration of the CBA in New Jersey. (Trial Exs. J-2 to J-4) The project only agreement, however, unlike the short form agreement, limited the scope of the CBA to just one project. (*See* Trial Exs. J-1 to J-2)

8. Before completing the Wyndham Hotel project, Plaintiff began construction on the International Trade Center ("ITC") shopping center in Mount Olive, New Jersey. (Stip. Fact ¶ 7)

9. At the end of January, 2002, a representative from Local No. 593, Carmen Perry, approached Plaintiff's project manager, Russell Bosco, to add union laborers for cleanup duty. (Stip. Fact ¶ 8)

10. Bosco informed Perry that Jayeff would hire union workers and pay all the benefits, but would not sign a full statewide CBA. (*See* Trial Tr. 153:1-11, July 9, 2012)

11. In response, Perry asked whether Jayeff would sign a project only agreement. (*Id.*) Bosco agreed to ask Jayeff's management. (*Id.*)

12. President John Zoller and Vice President Craig Ossenfort agreed to enter into a project only agreement for the ITC project. (Trial Tr. 159:2-7, July 9, 2012) The document Jayeff actually signed, however, was a short form agreement dated February 28, 2002 with a preprinted notation indicating that the agreement would expire on April 30, 2002. (*Id.*; Stip. Fact ¶ 11) At the time of the ITC project, the full statewide CBA expired on April 30, 2002. (Trial Ex. D-1) Accordingly, the parties' agreement merely noted the day that the full statewide CBA expired.[3]

13. The language of the project only and short form agreements differ in only a few respects: (1) the project only agreement was sub-titled "Project Only Form;" (2) the last sentence of the project only boilerplate reads "[t]his Project

---

[3] Although the full statewide CBA provided for an automatic year to year renewal, LIUNA's Assistant Regional Manager Patrick Byrne testified that the automatic renewal provision would not apply because the agreement was signed within the notice period for termination.

5

Only Agreement is subject to approval by the District Council;"[4] (3) the project only agreement had a blank line for "Project Name;" (4) the project only agreement had a blank line for "Project Location;" (5) the project only form had a line for the initials of the "District Council Business Manager Approval." (Trial Exs. J-1 to J-4) In practice, the union used both the project only and short form agreements interchangeably for project specific arrangements. (Trial Ex. P-2) However, the signatory usually handwrote language limiting the scope of the short form agreement to indicate a project specific arrangement. (Trial Ex. P-2)

14. The February 28 ITC short form agreement had a handwritten notation in the bottom left-hand corner that states "Mt. Olive." (Trial Ex. J-2) No party was able to identify, however, whether that notation was inserted after signing the document.

15. On April 18, 2002, Plaintiff received a letter from Local No. 593 advising Plaintiff that the old agreement would expire shortly and Plaintiff would need to sign a new one. (Stip. Fact ¶ 12)

16. Jayeff required laborers to work past April 30, 2002 and was amenable to extending the agreement. (Trial Tr. 99:1-17, July

---

[4] In practice, the project only agreements were not always submitted to the District Council for approval. (Trial Ex. P-2)

6

9, 2012)

17. Schwarz signed a new short form agreement dated June 19, 2002, which contained no limiting language either by time or by project. (Trial Ex. J-4) The June 19 short form agreement incorporated the new statewide CBA with an expiration date of April 30, 2007. (Trial Ex. J-4) Jayeff did not see a copy of the new CBA, however, until 2004. (Trial Ex. P-7)

18. By signing the new short form agreement, Schwarz believed he was merely extending what he believed to be the ITC project only agreement. (Trial Tr. 99:14-17, July 9, 2012) Schwarz did not intend to relinquish all open shop rights within the state of New Jersey for the following five years. (Trial Tr. 100:19-22, July 9, 2012)

19. The union had, or should have had, a similar understanding of the agreement. Bosco informed Perry on several occasions that Jayeff would not cede its open shop rights. (*See* Trial Tr. 153:1-11, July 9, 2012)

20. Attached to the short form agreement was an internal union document entitled "Newly Organized Contractor Report." (Trial Ex. J-4a) The form notes that only one laborer was added as a result of the agreement. (*Id.*) Jayeff, however, had multiple contemporaneous construction projects in New Jersey. This internal union document indicates, and the Court finds, that the union believed the agreement applied only to the ITC project.

7

21. In 2004, Plaintiff began construction on a Walgreens Pharmacy in East Windsor, New Jersey. (Stip. Fact ¶ 15)

22. During that project, Jose Colon of the Southern New Jersey Building Laborers' District Council ("Southern Council") requested Jayeff's assistance in tracking the whereabouts of Andre Construction trucks. Andre was a concrete company with whom Jayeff had subcontracted. (Trial Tr. 33:23 to 34:3, July 9, 2012)

23. Colon alleged that Andre had shirked union responsibilities. (Trial Tr. 34:1-8, July 9, 2012)

24. When Jayeff refused to help Colon track Andre, the Southern Council took the position for the first time that Jayeff was a signatory to the statewide CBA. (Stip. Fact ¶¶ 15-16)

25. Despite Jayeff openly working on several non-union projects throughout New Jersey prior to the Walgreens project, including several projects within the jurisdiction of Local Nos. 593 and 594, Defendants never alleged that Jayeff violated a statewide CBA prior to 2004. (Stip. Fact ¶ 16; Trial Tr. 32:20-23, July 9, 2012)

26. On February 11, 2004, Plaintiff attempted to cancel the CBA. (Trial Ex. P-4)

27. On February 18, 2004, LIUNA's Assistant Regional Manager, Patrick Byrne, informed Jayeff that the agreement did not expire until April 30, 2007 and withheld consent to prematurely terminate the CBA. (Stip. Fact ¶ 18) Plaintiff

responded by requesting a copy of the signed CBA. (*Id.*)

28. Sometime after March 8, 2004, LIUNA forwarded a copy of the short form agreement executed on June 19, 2002 and a copy of the CBA to Jayeff. (Stip. Fact ¶ 19) This was the first time Jayeff had seen the new CBA. (Stip. Fact ¶ 19)

29. Defendants did not take the position that a short form agreement dated June 11, 2002 bound Jayeff to the full statewide CBA until this litigation.

30. In June of 2002, Jayeff was construction manager on a Kohl's in East Brunswick. Jayeff employed two college-aged relatives of a Jayeff manager. (Trial Tr. 77:1-10, July 9, 2012)

31. John Adams, a Local No. 594 business agent, asked Jayeff to employ a union laborer for cleanup. (*Id.*) Jayeff agreed, but warned Adams that the college kids would remain employed for the summer. (*Id.*)

32. Adams requested that Jayeff sign an agreement for the union laborer. (Trial Tr. 77:2-10, July 9, 2012)

33. Schwarz believed that he was signing a project only agreement, but he actually signed a short form agreement dated June 11, 2002. (Trial Ex. J-3) Schwarz did not believe he was giving up all open shop rights in New Jersey. (Trial Tr. 101:6-10, July 9, 2012)

34. The June 11 short form agreement, however, did not contain language limiting the agreement either by date or by

9

project. (Trial Ex. J-3)

35. After executing the agreement, Adams did not object to the non-union college kids working on the job site. (Trial Tr. 78:11-14, June 9, 2012) Nor did Adams assert union rights against Jayeff at other construction projects utilizing non-union labor throughout New Jersey.

36. The existence of multiple signed short form agreements supports Jayeff's version of events. In theory, a single validly signed short form agreement would bind Jayeff to the full statewide CBA. Signing more than one short form agreement would, therefore, be unnecessary. By contrast, a new project only agreement would have to be signed for each individual project. Multiple signed short form agreements supports the Court's conclusion that the parties intended to enter project specific agreements.

## II. Conclusions of Law

Plaintiff argues that the agreements must be reformed due to fraud in the execution. Defendants argue that the short form agreements speak for themselves. Defendants further argue that fraud in the execution cannot be proven where, as here, Plaintiff had a reasonable opportunity to read the full CBA had they only asked to see a copy.

The parties agree that 29 U.S.C. § 1145 controls:

10

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

The Third Circuit has interpreted this statutory provision "as severely limiting the defenses available to an employer who has signed an agreement which commits it to make contributions to a benefit fund." *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 490 (3d Cir. 1994). Three defenses remain available, only one of which is raised and relevant here: "[T]he collective bargaining agreement is void *ab initio*, as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement . . . ." *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992).

To prove fraud in the execution, "a party must show 'excusable ignorance of the contents of the writing signed.'" *Id.* (quoting *Southwest Admins., Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986)). "Fraud in the execution arises when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." *Rozay's Transfer*, 791 F.2d at 774 (quoting J. White & R. Summers, Uniform Commercial Code § 3-305(2)(c) (2d Ed. 1980). A party claiming fraud in the execution must show that he 'signed an instrument that is radically different from that which [he] is led to believe that he is signing.'" *Connors*, 30 F.3d at 491

11

(quoting John d. Calamari & Joseph M. Perillo, *The Law of Contracts* § 17-10 (3d ed. 1987)).

The evidence demonstrates that Schwarz signed a document that was radically different from the one contemplated through collective bargaining. Seventy-five percent of Jayeff's business came from non-union projects. Jayeff alerted union representatives that it was an open shop and intended to remain so. *See New Jersey Regional Council of Carpenters v. Jayeff Const. Corp.*, 2011 WL 4810039, *3 (D.N.J. 2011) (holding that submitting union benefit remittance forms with boilerplate language incorporating the statewide CBA by reference did not bind Jayeff to the statewide CBA), *appeal docketed*, No. 11-3872 (3d Cir. Oct. 18, 2011). For example, Bosco told Perry that Jayeff was an open shop contractor and would sign agreements for one project only. Zoller told union representatives that Jayeff was an open shop or that "the client elected not to go union." (Trial Tr. 9:9, July 9, 2012)

Moreover, for fifteen years, Jayeff's course of conduct with the unions was to employ laborers without a contract. To placate the union starting in 2001, Schwarz agreed to sign project only agreements, and was led to believe that he was signing project only agreements, but actually signed two short form agreements. Schwarz did not read, and the union did not provide, the full statewide CBA because the parties did not agree to enter into a

statewide CBA. Although the union representatives may not have maliciously sent Schwarz the short form agreement instead of the project only agreement, Jayeff nevertheless was led to sign agreements substantially different from the ones agreed upon. *See Joseph W. Davis, Inc. v. Int'l Union of Operating Engineers, Local 542*, 636 F. Supp. 2d 403, 417 (E.D. Pa. 2008) (denying summary judgment where the contractor signed a short form agreement based on union misrepresentations about the scope of the agreement). Given the facial similarities between the two documents and the parties' collective bargaining discussions, Schwarz was excusably ignorant of the contents of the short form agreements. *See Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F.Supp. 683, 690 (E.D. Mich. 1997) (finding fraud in the execution where a contractor assented to a project only arrangement, but mistakenly signed a short form agreement).

   Several facts support this conclusion. For example, the union did not attempt to enforce the June 19, 2002 short form agreement until two years after its execution. Indeed, it was not until this litigation that Defendants attempted to enforce the June 11, 2002 short form agreement. Moreover, after signing these agreements, Jayeff worked on non-union construction projects within the jurisdictions of Local Nos. 593 and 594 without labor unrest. Neither party acted as though the short form agreements

bound Jayeff to the statewide CBA.

This is not a case of fraud in the inducement where a contractor merely misunderstands the implications of a CBA. Instead, this is a case of fraud in the execution where the material terms of a signed short form agreement were radically different than the project only agreement to which the parties agreed. Accordingly, the Court will enter a declaratory judgment voiding the June 11 and June 19 short form agreements.

### III.

For the foregoing reasons, a declaratory judgment will be entered in favor of Plaintiff.

Dated: 7/27/12                          /s/ Joseph E. Irenas

**JOSEPH E. IRENAS, S.U.S.D.J.**